UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Michelle Batease,

  Plaintiff,

  v.                Civil Action No. 2:16-cv-133-jmc

Nancy A. Berryhill, Acting
Commissioner of Social Security[1],

  Defendant.

## OPINION AND ORDER
(Docs. 12, 13)

  Plaintiff Michelle Batease brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court are Batease's motion to reverse the Commissioner's decision (Doc. 12), and the Commissioner's motion to affirm the same (Doc. 13).  For the reasons stated below, Batease's motion is DENIED, and the Commissioner's motion is GRANTED.

## Background

  Batease was 36 years old on her alleged disability onset date of October 1, 2008.  She completed school through the ninth grade and does not have a GED.  Her job history consists of working as a dishwasher/kitchen helper, a fast-food worker, a parking lot

---

[1] The Court has amended the caption to reflect the current Acting Commissioner of Social Security, who assumed office on January 20, 2017.  *See* Fed. R. Civ. P. 25(d).

attendant at a ski resort, a factory worker, and a cashier at Kmart.  She has four children who ranged in age from 17 to 23 on September 30, 2014, the date of the administrative hearing in this matter.  She also had a son who died in 1995 at the age of six, when he was hit by a car.

Batease was in an abusive marriage for many years: the couple were together for 10 years, separated for five, and then back together for another eight, until they divorced in 2012.  (*See* AR 744, 850, 870.)  Batease's living situation has varied over the years.  In April 2010, she was living with her 17-year-old son, her young adult daughter, and her daughter's boyfriend; Batease reported that they "f[au]ght with each other constantly" (AR 744) and there was a lot of stress in the household (AR 726).  In January 2013, Batease was living in an apartment with her boyfriend and daughter.  (AR 852.)  In April of the same year, she was living with her mother and step-father.  (AR 865–66, 871.)  And in September 2014, she was living with her 21-year-old son and her boyfriend of over four years.  (AR 49–50.)  Batease does not have a driver's license, as it is "under suspension" due to her failure to pay tickets for violations.  (AR 50.)

Batease suffers from back pain, heart problems, carpal tunnel syndrome (CTS), temporomandibular joint disorders (TMJ), right shoulder pain, and depression.  In April 2013, she told an examining psychological consultant that her depression and anxiety began when her son was killed in 1995, and that she attempted suicide by cutting her wrists five times since 2011.  (AR 871; *see also* AR 855.)  Batease testified at the September 2014 administrative hearing that, on a typical day, she sits at home and plays games on the computer, lays down with a heating pad on her back, sits in a chair, does

dishes (for no more than 10 minutes at a time), and watches television. (AR 71–72, 74, 78; *see also* AR 866, 872.) She further testified that she has no friends and does not see family members often. (AR 72.) She stated that she had been close with her mother, but she passed away prior to the hearing. (*Id.*; *see also* AR 66.)

On January 24, 2013, Batease protectively filed applications for DIB and SSI, alleging that she has been unable to work due to her heart problems, major depressive disorder, chronic back pain, TMJ, CTS, "[h]istory of cutting and suicidal," and "[n]o spleen." (AR 306.) She explained that her back "hurts all the time" (AR 327); she can hardly walk when she gets up in the morning (*id.*); and she has chest pain and shortness of breath (AR 328). Regarding her depression and anxiety, Batease explained that she cries and thinks about cutting herself "all the time" (AR 327), and that she gets really hot and has a hard time breathing when she goes out in public (AR 328).

Batease's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on September 30, 2014 by Administrative Law Judge (ALJ) Paul Martin. (AR 44–103.) Batease appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified at the hearing. On January 7, 2015, the ALJ issued a decision finding that Batease was not disabled under the Social Security Act at any time from her alleged onset date through the date of the decision. (AR 16–30.) Thereafter, the Appeals Council denied Batease's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted her administrative remedies, Batease filed the Complaint in this action on May 27, 2016. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the

national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Batease had not engaged in substantial gainful activity since her alleged onset date of October 1, 2008. (AR 18.) At step two, the ALJ found that Batease had the following severe impairments: sciatica, CTS, and depression. (*Id.*) Conversely, the ALJ found that Batease's TMJ and right shoulder pain were non-severe. (AR 19–20.) At step three, the ALJ found that none of Batease's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 20.)

Next, the ALJ determined that Batease had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with the following additional limitations:

> [She can] lift[] 20 pounds occasionally and 10 pounds frequently; stand[] and walk[] four hours in an eight[-]hour workday; sit[] six hours in an eight-hour workday; occasionally climb[] ramps, stairs, ladders, ropes, and scaffolds; frequently kneel[]; [and] occasionally crouch[] and crawl[]. She is limited to frequent bilateral fingering for up to 20 minutes at a time before requiring a break. She must avoid fast-paced production requirements as well as complex tasks. She can maintain concentration, persistence, and pace for two[-]hour[] blocks; understand, remember, and carry out one[-]to[-]three[-]step tasks in a standard production pace setting; and make simple decisions. She can interact briefly on routine matters with the public, coworkers, and supervisors. She can adapt to routine workplace changes and travel. She must avoid hazards.

(AR 22.) Comparing this RFC with the physical and mental demands of Batease's past relevant work, the ALJ found that Batease was able to perform her past work as a fast-food worker, a parking lot attendant, and a cashier. (AR 29–30.) The ALJ concluded that

Batease had not been under a disability from her alleged disability onset date of October 1, 2008 through the date of the decision. (AR 30.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **Analysis**

Batease argues that the ALJ's step-four finding that she can return to her past relevant work is not supported by substantial evidence because the ALJ improperly weighed the medical source opinions and thus assigned an inaccurate RFC determination to Batease. The Commissioner responds that the ALJ's evaluation of the medical opinions was proper, and substantial evidence supports the ALJ's RFC determination. For the following reasons, the Court finds in favor of the Commissioner.

Batease asserts that the ALJ should have given controlling weight to at least one of the opinions of her treating primary care physician, Michael Scovner, MD, who began treating Batease in August 2007 or earlier. (Doc. 12 at 4–5; *see* AR 415.) In April 2010, Dr. Scovner opined in forms completed for "Reach Up Financial Assistance" that Batease could stand for only up to three hours, sit for only up to three hours, and lift only 10–20 pounds. (*See* AR 507, 524.) Dr. Scovner stated that Batease was very depressed and unable to participate in work-related activities for at least the next three months; and he recommended that Batease apply for social security disability benefits. (*Id.*)

In September 2014, Dr. Scovner opined in a "Treating Source Statement - Physical" that, due to her physical problems including severe lower back pain, Batease is only able to: lift 10 pounds for one hour per day, carry 10 pounds for 30 minutes per day, reach for

7

15 minutes per day, and push/pull for 15 minutes per day with her right hand and one hour per day with her left hand.  (AR 1295–97.)  Dr. Scovner further opined that Batease: is able to stand/walk for only one hour in an eight-hour day; must be allowed to shift positions at will from sitting, standing, and walking throughout the day; and requires a five-minute unscheduled break every hour.  (AR 1296–97.)  Dr. Scovner concluded that Batease would miss more than four days of work each month as a result of her physical impairments.  (AR 1300.)  Also in September 2014, Dr. Scovner completed an assessment of Batease's mental abilities, opining that she is "[s]eriously limited" in many areas of mental functioning, including maintaining attention, maintaining attendance, and working in coordination with or proximity to others.  (AR 1301.)  Dr. Scovner further opined that Batease would miss more than four days of work per month due to her mental impairments.[2]  (AR 1302.)

     Dr. Scovner regularly treated Batease for at least seven years.  He is thus a "treating physician," as defined in the regulations, and the ALJ was required to evaluate his opinions under the "treating physician rule."  *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983); *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) ("A claimant's treating source is his or her own physician, . . . who has provided the [claimant] with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual.").  Under that rule, an ALJ must give "controlling weight" to the opinions of a treating physician if those opinions are "well[]supported by medically

---

[2] In seeming contradiction to this opinion on Batease's mental limitations, in his "Treating Source Statement - Physical," Dr. Scovner checked a box indicating that "emotional or psychological factors" did not "contribute to the severity of [Batease's] symptoms and functional limitations."  (AR 1298.)

8

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993). Here, the ALJ gave "little weight" to Dr. Scovner's opinions for the following stated reason: "the limitations cited in Dr. Scovner's assessment *contrast sharply with the other evidence of record*, including his own [treatment] notes, as well as the reports from consultative examiners and specialists." (AR 28 (emphasis added).) In other words, the ALJ found that Dr. Scovner's opinions are inconsistent with other substantial evidence in the record and thus not worthy of "controlling weight." This analysis clearly applied "the correct legal standard," *Machadio*, 276 F.3d at 108, as quoted above from the applicable regulation, 20 C.F.R. § 404.1527(c)(2). Thus, assuming the ALJ's finding that Dr. Scovner's opinions are inconsistent with other substantial evidence is itself supported by substantial evidence (discussed in detail below), the ALJ made no error in declining to afford controlling weight to Dr. Scovner's opinions. *See Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)).

Where, as here, the ALJ does not afford controlling weight to the opinions of a treating physician, the ALJ must consider various "factors" to determine how much weight

9

to give the opinions. 20 C.F.R. § 404.1527(c). Among those factors are: the frequency of examination and the length, nature, and extent of the treatment relationship; the evidence in support of the treating physician's opinion; the consistency of the opinion with the record as a whole; whether the opinion is from a specialist; and other factors that tend to support or contradict the opinion. *Id.* The regulations also specify that the Commissioner "will always give good reasons" for the weight given to a treating source's opinions. *Id.* at § 404.1527(c)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503, 505 (2d Cir. 1998) (Commissioner must give "good reasons" for the lack of weight attributed to treating physician's opinions). Here, the ALJ gave a good reason to afford "little weight" to Dr. Scovner's opinions: they are inconsistent ("contrast sharply with") the other record evidence (AR 28). *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Of course, this rationale is legally sufficient only if it is supported by "substantial evidence," which the Second Circuit defines as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).[3] The Court finds that substantial evidence does in fact support the ALJ's rationale. For example, as the ALJ noted in his decision, treatment notes from the relevant period indicate that Batease had full range of her upper extremities with no muscle atrophy or

---

[3] The "substantial evidence" standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard. The substantial evidence standard means once an ALJ finds facts, [the district court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citation and internal quotation marks omitted).

10

joint swelling. (AR 25, 426, 867.) And an MRI of Batease's lumbar spine showed mild degenerative disc disease but no disc herniation or other remarkable findings. (AR 25, 423, 431; *see also* AR 913 (x-rays of spine showing "a fairly well-aligned lumbar spine").) Overall, the treatment notes demonstrate that, although Batease had some pain and reduced range of motion in her back,[4] she was neurologically intact and had good overall alignment of the lumbar spine, normal strength, full range of motion, and an intact gait. (*See, e.g.*, AR 25, 370, 423, 452–53, 469, 482, 485, 518, 610, 690, 739, 770, 867, 883, 913–14, 996, 1122.) These treatment notes, which are principally based on treating and consulting medical professionals' physical examinations of Batease, do not support the extreme physical limitations that Dr. Scovner opined Batease suffered from.

Regarding Batease's manipulative and pushing/pulling/reaching limitations, the evidence demonstrates that after her 2008 and 2014 bilateral carpal tunnel release surgeries, her symptoms mostly resolved and she had improved range of motion and good grip strength and sensation with no atrophy or tenderness in her hands. (*See, e.g.*, AR 426–27, 581, 800–01, 867, 996, 1158–59.) In May 2008 for example, treatment notes from Dr. Ann Stein state that, since her April 2008 carpal tunnel release, Batease "has been doing quite well and has had nice resolution of her symptoms." (AR 581.) Dr. Stein recommended a "gradual increase in activity" and estimated that Batease "should be able to return to work by June 9, 2008." (*Id.*) The record does not demonstrate that Batease

---

[4] After examining Batease, medical consultant Dr. Luther Emerson found that "[t]he prognosis of [Batease's] back pain depends on whether she seeks therapy for it." (AR 868.)

had the significant pushing/pulling/reaching limitations opined by Dr. Scovner (*see* AR 1297).

The record similarly does not support the extreme mental limitations that Dr. Scovner opined Batease had.  For example, as the ALJ noted, although Batease reported being depressed, isolating herself in her room, and cutting herself on several occasions in an attempt to commit suicide (*see, e.g.*, AR 452, 518, 871), her mental examinations were mostly normal, consistently showing that she had normal thoughts, related adequately with others, and was cooperative and socially appropriate (AR 26, 29, 872).  Notably, she earned a score of 30 out of 30 on the Mini Mental Status Examination, a test used to measure cognitive impairment.  (AR 872.)  The record also reveals that Batease had normal speech and concentration and intact memory; and that she was future-oriented and showed no signs of severe depression.  (*See, e.g.*, AR 469, 482, 729–30, 741, 854.)  For example, an April 2010 hospital note states that, upon her discharge after a three-day voluntary admission to the psychiatric unit following a suicide attempt, Batease "had no suicidal ideation, intent, or plan[,] [and] "was future[-]oriented, bright, and without any significant depression."  (AR 741.)  Batease herself stated in a January 2013 Function Report that she was independent in her activities of daily living, could follow written and spoken instructions, and got along well with authority figures.  (AR 283–88; *see also* AR 738.)  The Commissioner correctly points out that basic communication like this is all that is needed to do unskilled work, and the ability to hear and understand simple oral instructions or to communicate simple information is sufficient.  (Doc. 13 at 6 (citing

SSR 96-9P, 1996 WL 374185, at *8 (July 2, 1996); SSR 85–15, 1985 WL 56857, at *4 (1985)).)

The treatment records, including those of Dr. Scovner himself, simply do not support the extreme limitations outlined in Dr. Scovner's opinions. The ALJ accurately stated:

> Despite [Batease's] complaints and [alleged] inability to work [due to] physical and mental problems, her own inconsistent statements and the medical record support the conclusion that her functional capacity is not as limited [as she alleges]; she can engage in activities not indicative of a person who is completely disabled.

(AR 23.) Of note, the ALJ reasonably questioned Batease's credibility (AR 23–24), and Batease has not persuasively refuted that finding. Furthermore, Dr. Scovner's opinions are inconsistent with those of nonexamining agency consultant Dr. Patricia Pisanelli, who opined that Batease could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for four hours, and sit for about six hours in an eight-hour workday. (AR 112, 127.) Although the opinions of treating physicians are generally given more weight than those of nonexamining agency consultants, the regulations permit the opinions of agency consultants to override those of treating physicians, when the former are more consistent with the record evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler*, 3 F.3d at 567–68 ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.")); *see also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining

13

sources."). Here, the opinions of agency consultant Dr. Pisanelli are more consistent with the record than those of treating physician Dr. Scovner, as discussed above. And no treating physician other than Dr. Scovner offered an opinion regarding Batease's ability to work. (*See* Doc. 14 at 3.)

Batease accurately points out in her Reply that the ALJ did not specifically discuss the opinions of Dr. Pisanelli in his decision. (*See* Doc. 14 at 3.) This error was harmless, however, given that Dr. Pisanelli's opinions are largely consistent with and duplicative of the findings contained in the ALJ's RFC determination, and the ALJ's decision would not have been different had he explicitly discussed those opinions. *See Gonzalez v. Colvin*, No. 15 Civ. 5011 (KPF), 2016 WL 6780000, at *16 (S.D.N.Y. Nov. 16, 2016) (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (ALJ's failure to consider even a treating physician's report could be harmless error if there was "no reasonable likelihood" that considering it would have changed the disability determination)). Batease also points out that the ALJ did not discuss nonexamining agency consultant Dr. Ellen Atkins's opinion that Batease could perform only simple tasks "in [a] low production norm setting" (AR 114, 129). (*See* Doc. 12 at 8, Doc. 14 at 3.) But again, this error was harmless, because the ALJ's decision would not have been different had he considered this opinion, given that substantial evidence supports the ALJ's finding that Batease could perform work "in a standard production pace setting" (AR 22) (*see, e.g.*, AR 26, 29, 287, 469, 482, 729–30, 741, 854, 872). *See Lynch v. Astrue*, No. 07–CV–249–JTC, 2008 WL 3413899, at *5 (W.D.N.Y. Aug. 8, 2008) ("ALJ's failure to refer to [agency consultant's] reports is, at best, harmless error, since consideration of the information contained in the reports would

14

not have changed the outcome of the hearing determination."); *Walzer v. Chater*, No. 93 Civ. 6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) ("ALJ's failure to [discuss treating physician's report] was harmless error, since his written consideration of [the] report would not have changed the outcome of the ALJ's decision.").[5]

Batease claims the ALJ erred in failing to consider the factors laid out in 20 C.F.R. § 404.1527(c) when assessing the weight of Dr. Scovner's opinions (Doc. 12 at 5–6), and in failing to assign a weight to several medical opinions including those of the agency consultants (*id.* at 7–8), as noted above.  It has been repeatedly held, however, that the ALJ need not explicitly discuss each of the regulatory factors; rather, he or she must apply "the substance of the treating physician rule."  *Halloran*, 362 F.3d at 32; *see Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("We [do not] require . . . slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").  As discussed above, the ALJ here fully reviewed the record evidence (including Dr. Scovner's own treatment notes, which did not substantially support his opinions); stated the weight given to Dr. Scovner's opinions (AR 28), *see Schisler*, 3 F.3d at 567 (ALJ required to articulate weight given to treating doctors' conclusions), recognizing the lengthy treatment relationship Dr. Scovner had with Batease (AR 24); and evaluated those opinions in light of their consistency with the rest of the record evidence, as required by the applicable

---

[5] In general, "remand is unnecessary, even if the ALJ ignores a treating physician's opinion, when the opinion is essentially duplicative of evidence considered by the ALJ, and the report the ALJ overlooked was not significantly more favorable to the plaintiff."  *Seekins v. Astrue*, Civil No. 3:11CV00264(VLB) (TPS), 2012 WL 4471266, at *5 (D. Conn. Aug. 14, 2012) (citing *Zabala*, 595 F.3d at 409–10).  "Where discussion of an omitted medical report 'would not have changed the outcome of the ALJ's decision,' such omission constitutes 'harmless error.'"  *Dombrowski v. Astrue*, No. 5:12–cv–638 (GLS), 2013 WL 528456, at *3 (N.D.N.Y. Feb. 11, 2013) (quoting *Walzer*, 1995 WL 791963, at *9).

15

regulation. Thus, the ALJ followed the substance of the treating physician rule, and his decision to give "little weight" to Dr. Scovner's opinions should not be disturbed.

Batease further argues that the ALJ erred in failing to articulate the weight given to the opinions of medical professionals other than Dr. Scovner.[6] (Doc. 12 at 7.) Batease claims this failure makes it "impossible for a reviewing court to ascertain how the ALJ derived the RFC." (*Id.*) But no law is cited in support of this argument (*see id.*), and ALJs are not required to explicitly assign weight to all medical opinions of record, particularly those of consulting (rather than treating) medical sources, as long as the ALJ considered the relevant medical opinions. *See Berry v. Comm'r of Soc. Sec.*, No. 14 Civ. 3977(KPF), 2015 WL 4557374, at *14–15 (S.D.N.Y. July 29, 2015) ("an ALJ's failure to state expressly the weight given to the opinion of a consultative source does not require reversal, so long as the ALJ took the evaluation into account in determining a claimant's RFC"); *Rodriguez v. Colvin*, No. 12–cv–3931 (RJS)(RLE), 2014 WL 5038410, at *6 (S.D.N.Y. Sept. 29, 2014) (declining to remand where ALJ considered a consultative examiner's assessment in determining plaintiff's RFC, but failed to "assign a specific, quantifiable weight" to the opinion); *see also Hamilton v. Astrue*, No. 12–CV–6291P, 2013 WL 5474210, at *16–17 (W.D.N.Y. Sept. 30, 2013). Here, although the ALJ did not specify the weight he gave to the opinions of examining consultants/providers Dr. Matthew Zmurko, Dr. Luther Emerson, and Marc Carpenter, MA, he did engage in a detailed discussion of those opinions, as well as their examination/treatment notes, in his

---

[6] It bears repeating here that no *treating* physician, other than Dr. Scovner, offered an opinion regarding Batease's ability to work.

16

decision. (*See* AR 24–29; *see also* AR 422–23, 865–69, 870–73, 913.) Moreover, as the ALJ noted, those opinions mostly support the ALJ's RFC determination. For example, Dr. Zmurko, who opined on Batease's physical impairments, recommended merely "conservative" treatment "with some physical therapy and . . . [an] aerobic exercise program." (AR 423; *see also* AR 913 ("[m]y recommendation was to treat this in a conservative manner, restarting some physical therapy").) Dr. Emerson, who also evaluated Batease's physical limitations, stated that the prognosis of her back pain depended on whether she sought therapy for it, and vaguely opined that she could sit for "at least" six hours and stand/walk for "at least" two hours per day. (AR 868.) And Carpenter, who saw Batease for a "psychological diagnostic interview" (AR 870), did not make findings on the severity of Batease's mental impairments, other than to state that her mental health symptoms "seem to significantly impact her daily activities, interests, and ability to relate to people." (AR 873.) Carpenter concluded his report by diagnosing Batease with major depressive disorder and generalized anxiety, and noting that Batease had other, non-medical problems, including "[p]roblems with [her] primary support group, problems related to the social environment, occupational problems, [and] economic problems." (AR 873.)

Batease argues that the ALJ erred in noting that Carpenter's consultative examination report referenced Batease's "lack of motivation" (AR 29). (*See* Doc. 12 at 9.) But in fact, Carpenter stated in his report that Batease did not attend group counseling despite her medical provider's advice to do so, which may fairly be read to indicate Batease's lack of motivation to obtain appropriate treatment, even despite her

17

rationalization that she could not attend group counseling because she "does not do well in groups."[7] (AR 872.) It was not error for the ALJ to consider this evidence. The regulations provide that if a claimant does not "follow the prescribed treatment without a good reason," he or she is not considered disabled. 20 C.F.R. § 404.1530(b); *see Calabrese v. Astrue*, 358 F. App'x 274, 277–78 (2d Cir. 2009) (failure to take medication as prescribed an appropriate factor to consider in assessing claimant's credibility); *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (proper for ALJ to use evidence of claimant's noncompliance to weigh credibility of claimant's subjective claims of pain).

Finally, Batease contends that the ALJ "substituted his judgment of the medical evidence for the treating physician's opinion[s]" (Doc. 12 at 6), and made his own medical conclusions to support his RFC determination. (*See* Doc. 12 at 6–9; Doc. 14 at 2–5.) ALJs cannot arbitrarily substitute their own judgment for competent medical opinion. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (alterations in original) (internal quotation marks omitted)). But that is not what the ALJ did here: as discussed above, the ALJ's decision—which is supported by substantial evidence—demonstrates that the RFC determination was not based on the ALJ's own judgment of the medical evidence, but rather on the medical evidence itself, on the opinions of various consulting medical professionals, and on the

---

[7] At the administrative hearing, Batease stated that she did not want to attend group therapy because she is "not comfortable around a bunch of people," and she "[did not] want the whole world to know [her] problems." (AR 67.)

record as a whole.  *See Credle v. Astrue*, No. 10–CV–5624 (DLI), 2012 WL 4174889, at *18 (E.D.N.Y. Sept. 19, 2012) ("[T]he Social Security Administration considers the data that physicians provide but draws [his or her] own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative." (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999))).

Batease's remaining arguments—regarding the ALJ's findings on Batease's postural limitations (stooping and balancing in particular) and her need to avoid hazards (*see* Doc. 12 at 8–9)—lack merit, as they are unsupported by either legal authority or substantial evidence in the record.

## **Conclusion**

For these reasons, the Court DENIES Batease's motion (Doc. 12), GRANTS the Commissioner's motion (Doc. 13), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 24th day of March, 2017.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge